BECKWITH ELECTRIC CO., INC.,
and Thomas Beckwith,
Plaintiffs,

v.

Kathleen SEBELIUS, Secretary of the United States Department of Health and Human Services; United States Department of Health and Human Services; Seth D. Harris, Acting Secretary of the United States Department of Labor; United States Department of Labor; Jack Lew, Secretary of the United States Department of the Treasury; and United States Department of the Treasury, Defendants.

Case No. 8:13–cv–0648–T–17MAP.

United States District Court,
M.D. Florida,
Tampa Division.

June 25, 2013.

Erin Elizabeth Mersino, Richard Thompson, Ann Arbor, MI, Paul Rodger Pizzo, Scott A. Richards, Fowler White Boggs, Tampa, FL, for Plaintiffs.

Michael Charles Pollack, Washington, DC, for Defendants.

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ELIZABETH A. KOVACHEVICH, District Judge.

Plaintiffs, Beckwith Electric Co., Inc. ("Beckwith Electric"), and Thomas R. Beckwith ("Beckwith"), seek a preliminary injunction to enjoin the enforcement of a regulatory mandate that compels health care coverage that would include provision of any FDA-defined emergency contraceptive and other named alternatives. As grounds for relief, plaintiffs rely on the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C § 2000bb, *et seq.*, and the Free Exercise Clause of the First Amendment. Having considered the positions of the parties and the *amici curiae,* and having heard oral argument on June 17, 2013, the Court finds that plaintiffs satisfied their burden at this stage and preliminary injunctive relief is appropriate. For the reasons stated below, the motion is **GRANTED.**

### BACKGROUND

Beckwith maintains that his ancestors arrived on the shores of America in 1626 to escape religious persecution in England. In 1967, Beckwith's mother and father started a family business in their garage in Illinois with financing provided by Beckwith's grandfather. From that beginning, the small, family-run start-up grew into what is now Beckwith Electric, a Florida corporation that employees 168 full-time employees to engineer, manufacture, and market micro-processor-based technology for the implementation and utilization of generators, transformers, and power lines. Today, Beckwith is the Chief Executive Officer and 92% shareholder of Beckwith Electric, which, although a secular, for-profit corporation, is operated according to and consistent with Beckwith's personal religious beliefs.

In both his personal and business endeavors, Beckwith "strive[s] to follow the teachings and values of the Southern Baptist" faith. (Dkt. 10). Beckwith believes that "a company managed under the living God's direction and by God's principles cannot engage in or promote activities that are contrary to such direction, principles, or moral compass." *Id.* at ¶ 13. One such belief "prohibit[s] [him] from providing, participating in, paying for, training others to engage in, or otherwise supporting emergency contraception, abortion, abortifacients, and any drugs, devices, and services that are capable of killing innocent human life." *Id.* at ¶¶ 11–12. Consequently, according to Beckwith's religious beliefs, he asserts that he cannot direct the company, of which he is the chief executive and principal shareholder, to allocate *its* resources to providing emergency contraceptives or abortion-causing drugs or devices. *Id.*

Beckwith Electric further inculcates these religious beliefs in its corporate environment. Beckwith personally arranges for corporate chaplains to visit Beckwith Electric on a weekly basis to assist employees with "difficult issues of bereavement, marriage, children, finances, addictions, elder care, and other types of crises." *Id.* at ¶ 17. Beckwith Electric also donates to various charities, both secular and religious, including New Life Solutions' Family Ministries, which is a "Christ-centered ministry offering hope, help, and healing for women, teens and families by promoting healthy lifestyle choices and relationships." *Id.* at ¶ 20–22.

As a secular, for-profit corporation employing 168 full-time employees, Beckwith Electric is required to provide insurance coverage to his employees pursuant to regulations promulgated pursuant to the Patient Protection and Affordable Care Act

("ACA"), Pub. L. 111–148, 124 Stat. 119 (2010), and the Health Care and Education Act, Pub. L. 111–152, 124 Stat. 1029. Through its insurance carrier, Humana, Beckwith provides insurance coverage to its employees. Beckwith was under the mistaken belief that the Humana group policy provided to Beckwith Electric's employees did not provide coverage for FDA-defined emergency contraceptives. *Id.* at ¶¶ 23–24. As it turns out, a Humana representative incorrectly informed Beckwith that his plan did not provide these services when in fact it may.[1] *Id.* Beckwith is now faced with the decision to either provide an insurance plan that meets the "minimum essential coverage" requirements, namely the FDA-defined emergency contraceptives, pursuant to the mandate, or face significant fines for noncompliance. Because Beckwith Electric's plan year anniversary is June 1, 2013, the date by which compliance was mandated has since come and gone. *Id.* at ¶¶ 47–49.

As a result, plaintiffs instituted this action on March 12, 2013. (Dkt. 1). By mandating insurance coverage for FDA-approved emergency contraceptives in contravention of their sincerely held religious beliefs, plaintiffs allege the defendants are violating: their First Amendment free exercise rights (Counts I–III), the Establishment Clause of the First Amendment (Count IV), the First Amendment freedom of speech (Count V), their First Amendment right of expressive association (Count VI), their religious freedom rights under the RFRA (Count VIII), and the Administrative Procedure Act ("APA") (Counts IX–XII). Plaintiffs ask this Court to declare the mandate unconstitutional, to preliminarily and permanently enjoin its enforcement against plaintiffs, and to award costs, including attorneys' fees, for bringing this action.

Currently before the Court is plaintiffs' motion for preliminary injunction filed on May 13, 2013, which is the same date plaintiffs effected service of process on the named defendants. (Dkts. 9, 10).[2] The government, of course, opposes plaintiffs' request for injunctive relief. (Dkt. 24).

In addition to the positions presented by the parties, the Court has had the benefit of several *amici curiae*.[3] With leave of this Court, the State of Florida, through the Office of the Attorney General, filed a brief supporting plaintiffs' request for injunctive relief. (Dkt. 36). Also supporting Plaintiffs' position, a collective *amici* brief was filed by the Association of Gospel Rescue Missions, Prison Fellowship Ministries, National Association of Evangelicals, Association of Christian Schools International, Ethics & Religious Liberty Commission of the Southern Baptist Convention, Institutional Religious Freedom

---

1. It is not entirely clear whether the Humana policy covers some (but not all) of the FDA-defined emergency contraceptives to which plaintiffs object. *See* (Dkt. 38). That will be borne out by a more complete record as the case develops. What is clear is that as of June 19, 2013, the group policy does not fully comply with the contraceptive mandate. *See id.*

2. Given the June 1, 2013, "trigger date" for the new insurance policy, plaintiffs filed an Emergency Motion for Expedited Consideration of Preliminary Injunction Motion and/or Motion to Withdraw Oral Argument. (Dkt.

25). The Court denied that request on the grounds that plaintiff should have brought the June 1, 2013 deadline to the Court's attention earlier than May 28, 2013, four days before the deadline. *See* (Dkt. 31). The plaintiffs notified the Court, after the hearing, that Beckwith Electric does not have an insurance policy that complies with the contraceptive mandate. (Dkt. 38) ("Plaintiffs' current insurance policy expressly excludes … Plan B, Ella, or any alternative … and copper IUDs").

3. The Court thanks the *amici* for their helpful and informative submissions.

Alliance, the C12 Group, and Christian Legal Society (collectively, "Religious Supporters"). (Dkt. 33). The American Civil Liberties Union and the American Civil Liberties Union of Florida (collectively, "ACLU") filed a collective *amici* brief in opposition to plaintiffs' request for injunctive relief. (Dkt. 23).

## ANALYSIS

Religious tolerance serves as an important foundational tenet in the governance of any society. A commonly misunderstood term, to "tolerate" does not mean with which to agree; it does not mean to understand; and, it most certainly does not mean to adopt a belief as one's own. By definition, to tolerate means "to recognize and respect (others' beliefs, practices, etc.) without sharing them." *Webster's New World Dictionary of the American Language* (2d College Ed. 1980). The notion of religious tolerance has echoed the halls of our country's history for centuries. *See* Patrick Henry, *Religious Tolerance,* Stokes 1:311–12 (1766) ("A general toleration of Religion appears to me the best means of peopling our country, and enabling our people to those necessarys [sic] among themselves, the purchase of which from abroad has so nearly ruined a colony, enjoying, from nature and time, the means of becoming the most prosperous on the continent."); Samuel Adams, *The Rights of the Colonists,* Writings 2:352–53 (Nov. 20, 1772) ("As neither reason requires, nor religeon [sic] permits the contrary, every Man living in or out of a state of civil society, has a right peaceably and quietly to worship God according to the dictates of his conscience ... [i]n regard to religeon [sic], mutual tolleration [sic] in the different professions thereof, is what all good and candid minds in all ages have ever practiced ..."). This case tests whether the challenged federal laws are "true to the spirit of practical accommodation that has made the United States a Nation of unparalleled pluralism and religious tolerance." *See Salazar v. Buono,* 559 U.S. 700, 130 S.Ct. 1803, 1821, 176 L.Ed.2d 634 (2010) (Alito, J., concurring in part).

The challenged statutory and regulatory provisions deal with the federally mandated provision of insurance coverage for, "with respect to women, such additional preventative care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg–13(a)(4). The Department of Health and Human Services ("HHS") tasked the Institute of Medicine ("IOM") to determine the appropriate guidelines for the provision of "preventative care" for women. *See* Institute of Medicine, Clinical Preventative Services for Women: Closing the Gaps 2 (2011). As a result, targeted insurance plans must now include all FDA-approved emergency contraceptives.

There are exemptions to the ACA and the HHS mandate. First, any plan that is "grandfathered" need not comply. Among other things, in order to qualify for "grandfathered" status, a plan must not have made any changes since March 23, 2010. Second, there is an exemption for non-profit companies that qualify as "religious employers." In response to concerns from various religious organizations the HHS proposed amendments to the regulations regarding the contraceptive mandate, and the advanced notice to the proposed rules states that the religious exemption would be broadened and there would be a "safe-harbor" for certain non-profit employers with religious exemptions. This exemption requires that employers have the following characteristics: (1) the inculcation of religious values is the purpose of the organization; (2) the organization primarily employs individuals who share the religious tenets of the organiza-

tion; (3) the organization serves persons who share the religious tenets of the organization; and (4) the organization is a nonprofit organization. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B).

Although there are several exemptions to the ACA and the HHS mandate, these plaintiffs do not qualify for any of them. The issue here is whether a non-exempt, secular, for-profit corporation has to comply with the ACA and contraceptive mandate in the face of an express religious belief that opposes the provision of contraceptive coverage.

The answer is entirely dependent on whether plaintiffs have a cognizable claim under the Religious Freedom of Restoration Act of 1993 ("RFRA").[4] In response to *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the case in which the Supreme Court upheld a generally applicable law that barred the receipt of unemployment compensation if a person was terminated for drug use (at issue was the sacramental use of peyote), Congress enacted the RFRA. According to the congressional findings enumerated in RFRA, "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment" and the Supreme Court in *Smith* "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. 2000bb(a)(1). "Congress recognized that 'laws neutral toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise,' and legislated 'the compelling interest test' as the means for the courts to 'strike sensible balances between religious liberty and

competing prior governmental interests.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). Congress, in effect, adopted the "compelling interest test" as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *Id.* at 431, 83 S.Ct. 1790. Although the Supreme Court struck down the RFRA as to state laws, *see City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), it at least implicitly recognized its constitutionality with respect to federal laws in *O Centro.*

■ Plaintiffs seek now seek preliminary injunctive relief under the RFRA and the First Amendment. The Court must, therefore, determine whether the plaintiffs can satisfy the requisite elements for a preliminary injunction: (1) likelihood of success on the merits, (2) irreparable harm, (3) the balance of the hardships, and (4) the public interest. *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.,* 299 F.3d 1242, 1246–47 (11th Cir. 2002). Before reaching the merits, the Court must determine if there is a cognizable case and controversy under Article III in order to establish the standing of each plaintiff before this Court. *Thomas v. Howze,* 348 Fed.Appx. 474, 476 (11th Cir. 2009).

## I. Plaintiffs have standing to bring the claim.

■ As a threshold matter, the Court has to determine whether a secular, for-profit corporation has standing to challenge the mandate to provide FDA-defined emergency contraceptives. "The three prerequisites for standing are that: (1) the

---

**4.** Plaintiffs do not present any argument to advance their claims under the First Amendment and the APA beyond those covered by the RFRA. It is of no consequence, however, because the remaining claims (if even cognizable) present a much more exacting standard than that under the RFRA.

plaintiff ha[s] suffered an 'injury in fact'—an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it be likely, not merely speculative, that the injury will be redressed by a favorable decision." *31 Foster Children v. Bush*, 329 F.3d 1255, 1263 (11th Cir.2003) (quoting *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). Neither the Supreme Court nor the Eleventh Circuit has had occasion to decide whether a secular, for-profit corporation has standing to assert a claim for free exercise of religion under either the First Amendment or the RFRA.

Although several district and circuit courts outside of the Eleventh Circuit have considered the issue, they have not taken a consistent analytical approach. First, some courts simply avoid the standing issue altogether.[5] Second, other courts hold (expressly or impliedly) that a corporate plaintiff has standing to challenge the contraceptive mandate but further hold that secular, for-profit corporations do not enjoy the right to exercise religion under either the First Amendment or the RFRA.[6] In other words, a corporation has a sufficient injury to establish constitutional standing even though that same corporation does not have the right to exercise religion as a matter of substance. As discussed later, that approach, which the government seems to be taking here, fails to appreciate the extent of the plaintiffs' alleged injury. Third, there are courts that hold that corporations have standing to assert the shareholder's free exercise rights under a pass-through instrumentality theory.[7] That approach focuses on the free exercise rights of the individual without any consideration of whether the corporation has any rights independent of the individual to exercise religion. Finally, another court, citing the Supreme Court's recent decision in *Citizens United*, held that an individual's decision to operate its business using a particular corporate form is simply "not dispositive," without elaborating any further.[8] By its citation to

---

**5.** *See Annex Med., Inc. v. Sebelius*, 2013 WL 1276025 (8th Cir.2013) (granting injunction pending appeal without discussing standing); *Autocam Corp. v. Sebelius*, No. 12–2673 (6th Cir.2012) (denying injunction pending appeal without discussing standing).

**6.** *See Conestoga Wood Specialities Corp. v. Sebelius*, 917 F.Supp.2d 394, 408 (E.D.Pa.2013) (holding that a corporation has standing, but "that the nature, history and purpose of the Free Exercise Clause demonstrate that it is one of the 'purely personal' rights referred to in *Bellotti* [435 U.S. 765, 778, 98 S.Ct. 1407 (1978) ], and as such, is unavailable to a secular, for-profit corporation."); *see generally Grote v. Sebelius*, 708 F.3d 850, 856 (7th Cir. 2013) (Rovner, J., dissenting) ("I begin my analysis with a threshold point: on the record before us, it is only the Grotes, and not the

corporate entities, which can claim to have the right to exercise religious freedoms.").

**7.** *See Geneva College v. Sebelius*, 929 F.Supp.2d 402, 415, 2013 WL 838238, at *6 (W.D.Pa. March 6, 2013) ("At this stage, the court finds that SHLC pleaded sufficient facts for the court to find that it has standing to assert its owners' RFRA and First Amendment claims."); *Monaghan v. Sebelius*, 931 F.Supp.2d 794, 802, 2013 WL 1014026, at *6 (E.D.Mich.2013) (finding that the corporate entity is the instrument through and by which the individual owner expresses his religious beliefs); *Legatus v. Sebelius*, 901 F.Supp.2d 980, 988 (E.D.Mich.2012) (same); *Tyndale House Pub., Inc. v. Sebelius*, 904 F.Supp.2d 106, 114–20 (D.D.C.2012) (same).

**8.** *See Korte v. Sebelius*, 2012 WL 6757353, at *3 (7th Cir. Dec. 28, 2012).

*Citizens United,* it is reasonable to presume that the court found no reason to distinguish between a corporation's right to exercise religion and the corporation's right to engage in political speech, as both are contained in the First Amendment. However, no court has expressly held that a secular, for-profit corporation can assert its own right to exercise religion.

Ostensibly retreating from earlier cases in which the government challenged the standing of the corporate plaintiff,[9] the government in this case concedes that the corporate plaintiff has standing but argues that the individual plaintiff does not.[10] Conceding that the corporate plaintiff has standing, although seemingly innocuous, presents a curious inconsistency. That is, to say that a corporation has standing to assert a claim challenging the contraceptive mandate, on the one hand, and then, on the other hand, argue later that it is not "substantially burdened" by the contraceptive mandate because it does not have the right to exercise religion seems to not fully appreciate an important component of the pending claims—that compliance with the contraceptive mandate is violative of its religious beliefs. *See Conestoga,* 917 F.Supp.2d at 407–08; *Grote,* 708 F.3d at 856 (Rovner, J., dissenting). Not convinced that the standing analysis is wholly distinct from the question of whether a corporate plaintiff can exercise religion (either directly or indirectly through its majority shareholder), the Court must examine the constitutional and prudential limitations, if any, on this Court's subject matter jurisdiction. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *ACLU of Florida, Inc. v. Miami–Dade County School Board,* 557 F.3d 1177, 1190 (11th Cir.2009) ("Because standing is a necessary component of our jurisdiction to hear cases and controversies under Article III of the Constitution, we must address it first.") (internal citations omitted).

It is prudent to begin by defining the injury. One could characterize the injury to the corporate plaintiff as simply being subject to the regulations. *See, e.g., Conestoga,* 917 F.Supp.2d at 404–05 (holding that the plaintiffs had Article III standing because the corporate plaintiff "would be subject to the regulations eventually"). "When the suit is one challenging the legality of government action or inaction ... [and] the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130. Of course, Beckwith Electric is subject to the contraceptive mandate, and there is little doubt that it will be subject to substantial financial penalties if it refuses to supply insurance coverage consistent with the regulatory mandate. But that does not address the alleged injuries in this case.

---

**9.** "The parties initially dispute whether Tyndale has standing to raise RFRA and free exercise claims. According to the defendants, [the corporation] is unable to assert such claims on its own behalf because it is a 'for-profit corporation [that] does not exercise religion' within the meaning of the RFRA and the First Amendment." *Tyndale House,* 904 F.Supp.2d at 114.

**10.** During the hearing on Plaintiffs' Motion for Preliminary Injunction, held on June 17, 2013, the government conceded that Beckwith Electric has standing to bring this claim, but maintained that Mr. Beckwith did not. During oral argument in *Grote v. Sebelius,* before a panel of judges in the Seventh Circuit, the government's lawyer argued that "the individual plaintiffs lack standing ... but the corporate plaintiff has standing." *See* Audio File of Oral Argument, May 22, 2013, available at http://media.ca7.uscourts.gov/sound/external/lj.13–1077.13–1077_05_22_2013.mp3.

As alleged, "the [m]andate forces employers and individuals to violate their religious beliefs because it requires employers and individuals to pay for and provide insurance from insurance issuers which fund and directly provide for drugs, devices, and services which violate their deeply held religious beliefs." (Dkt. 1, ¶ 9). More specifically, the "[m]andate violates Plaintiffs' rights to the free exercise of religion and the freedom of speech under the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act." (Dkt. 1, ¶ 12). By their own allegations, the plaintiffs are seeking redress from the contraceptive mandate's purported violation of their right to exercise religion, as opposed to merely being subject to eventual fines for non-compliance. Beyond the constitutional limitations of standing, the court's own prudential constraints typically require that a party assert only a violation of its own rights even when an injury-in-fact is demonstrated. *See Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). Beckwith Electric can, therefore, only have standing to bring this suit if, as a secular, for-profit corporation, it either has its own or can assert its individual owner's free exercise rights under the RFRA and the First Amendment. Each will be discussed in turn.

## A. Corporations have the right to exercise religion under the First Amendment and the RFRA.

■ Beginning with its statutory text, a stated purpose of the RFRA is "to provide

a claim or defense to *persons* whose religious exercise is substantially burdened by the government." 42 U.S.C. § 2000bb(b)(2) (emphasis added). Often times, the relevant statutory text will unambiguously apply to a corporation, either by direct reference or by defining the term "person" to include corporations and the like. The RFRA does neither. Plaintiffs suggest the Court turn to the Dictionary Act in Title 1 of the United States Code, which defines "person" as including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Absent some indication that Congress meant to exclude corporations, it is generally fair to assume that corporations are considered "persons" under most statutory schemes. *See F.C.C. v. AT & T, Inc.,* ── U.S. ──, 131 S.Ct. 1177, 1183, 179 L.Ed.2d 132 (2011) ("We have no doubt that 'person,' in a legal setting, often refers to artificial entities."); *see, e.g., Ruppel v. CBS Corp.,* 701 F.3d 1176, 1181 (7th Cir.2012).[11] The statute itself purports to impose a heightened burden on the free exercise claims of "persons." While the RFRA does not define the term "person," it is evident that Congress responded to what it perceived as an incorrect decision in *Smith. See* 42 U.S.C. §§ 2000bb(a)(1) (referring to the recognition of free exercise by the Framers of the Constitution); (b)(1) (finding that the "compelling interest test in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests"). Recognizing that Congress only

---

11. In *F.C.C. v. AT & T,* the Supreme Court held that the term "personal privacy," as used in the Freedom of Information Act, did not extend to corporations because it made little sense in the context of a statutory scheme that served to protect an individual's privacy interest in certain records. *Id.* at 1185–86. The

Supreme Court was not defining the term "person," and the statutory scheme constructed in the FOIA did "not call upon [them] to pass on the scope of a corporation's 'privacy' interests as a matter of constitutional or common law." *Id.* at 1184.

has the power to enforce—but not redefine—constitutional principles, *see Boerne,* 521 U.S. at 519, 117 S.Ct. 2157, it seems likely that Congress used the term in the statute as being co-extensive with the term "person" as used in the Constitution.[12]

The Supreme Court has interpreted the Constitution to provide corporations with a wide array of what may often be considered individual rights protections. The Supreme Court has recognized, for instance, that corporations are persons under the First Amendment for various forms of speech. *See, e.g., Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 342, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (holding that corporations have the right to engage in political speech by spending money to support candidates for public office); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rel.,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (holding that corporations have the right to engage in commercial advertising). Corporations have also been afforded constitutional guarantees outside of the First Amendment. *See, e.g., United States v. Martin Linen Supply Co.,* 430 U.S. 564, 575–76, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977) (holding that corporations are entitled to double jeopardy protection); *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (citing *Go–Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931)) (holding that corporations have Fourth Amendment rights); *Kentucky Fin. Corp. v. Paramount Auto Exch. Corp.,* 262 U.S. 544, 550, 43 S.Ct. 636, 67 L.Ed. 1112 (1923) ("That a corporation is a 'person' within the meaning of the due process and equal protection clauses of the Fourteenth Amendment ... is equally well settled."). In contrast, the Supreme Court has identified certain "purely personal" guarantees

for which the Constitution does not provide protection for corporations. *See, e.g., Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) (holding that corporations are not afforded the privilege against self-incrimination); *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 66, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (recognizing that "corporations can claim no equality with individuals in the enjoyment of the right to privacy"). These cases drive home the point that corporations are not always entitled to the protections of the Constitution—it depends on the rights at issue. Because the Supreme Court has never resolved "the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment[,]" *see First National Bank of Boston v. Bellotti,* 435 U.S. 765, 779 at n. 14, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the question here is whether a secular, for-profit corporation enjoys the right, independent of the individuals who operate and own it, to freely exercise religion under the First Amendment.

 "Whether or not a particular guarantee is 'purely personal' or is unavailable to corporations for some other reasons depends on the nature, history, and purpose of the particular constitutional provision." *Bellotti,* 435 U.S. at n. 14, 98 S.Ct. 1407. Starting with its text, the First Amendment reads:

> Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof,* or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

---

**12.** It is appropriate to apply First Amendment jurisprudence to claims brought pursuant to

the RFRA. *See Tyndale House,* 904 F.Supp.2d at n. 9.

U.S. Const. amend. I. (emphasis added). The Supreme Court has already determined that the text of the First Amendment does not provide any reason to distinguish between a "natural person" and a corporation for political speech purposes. *See Citizens United,* 558 U.S. at 365, 130 S.Ct. 876 ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity."). As Justice Scalia pointed out in his concurrence, "[i]ts text offers no foothold for excluding any category of speaker, from single individuals to partnerships of individuals, to unincorporated associations of individuals, to incorporated associations of individuals—and the dissent offers no evidence about the original meaning of the text to support any exclusion." *Id.* at 393, 130 S.Ct. 876 (Scalia, J., Alito, J., concurring, Thomas, J., concurring in part). Likewise, there is nothing to suggest that the right to exercise religion, which immediately precedes the right to free speech in the First Amendment, was intended to treat any form of the "corporate personhood," including corporations, sole proprietorships and partnerships, any differently than it treats individuals. To write into the text of the First Amendment such a distinction, especially when there seems to be no evidence that such a distinction mattered to the Framers, would seem to be in conflict with the Supreme Court's holding in *Citizens United.* While the issue is a close one, the Court concludes that a corporation is a "person" under the First Amendment and the RFRA.

### B. Closely-held corporations, such as Beckwith Electric, can assert the free exercise rights of their owners under the RFRA and the First Amendment.

Close calls can go either way. In this case, even if the earlier question come outs differently the result is the same because Beckwith Electric has standing to assert the free exercise rights of Beckwith. Several courts addressing this precise issue have already determined that a corporation has standing to assert the free exercise rights of its owners. *See Geneva College,* 929 F.Supp.2d at 429, 2013 WL 838238, at *20; *Monaghan,* 931 F.Supp.2d at 802, 2013 WL 1014026, at *6; *Legatus,* 901 F.Supp.2d at 988; *Tyndale House,* 904 F.Supp.2d at 114–20. These cases rely on two Ninth Circuit decisions that held that the secular, for-profit corporation was "merely the instrument through and by which [the plaintiffs] express[ed] their religious beliefs." *See, e.g., Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1120 (9th Cir.2009); *EEOC v. Townley, Eng'g & Mfg. Co.,* 859 F.2d 610, 620 (9th Cir.1988). For the reasons that follow, the Court finds this line of reasoning quite persuasive. *See Tony and Susan Alamo Found. v. Sec. of Labor,* 471 U.S. 290, 303 at n. 26, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (finding that a nonprofit foundation had standing to bring free exercise claim on behalf of it associates, "who are members of the religious organization as well as employees under the Act").

A brief foray into the nature, history, and purpose of the Free Exercise Clause and the role of corporations during the founding era is instructive on the matter. *See generally Bellotti,* 435 U.S. at n. 14, 98 S.Ct. 1407; *but see Citizens United,* 558 U.S. at 386, 130 S.Ct. 876 (Scalia, J., Alito, J., concurring, Thomas, J., concurring in part) (criticizing the dissent's approach to "embark[ ] on a detailed exploration of the Framer's views about the 'role of corporations in society"). "Of course the Framers' personal affection or disaffection for corporations is relevant only insofar as it can be thought to be reflected in the understood meaning of the text they enacted—not ... as a freestanding substitute for that text." *Id.*

■ The purpose of the Free Exercise Clause is "to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Sch. Dist. of Abington Twp. v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The freedom to exercise religion, along with the other freedoms encompassed by the First Amendment, has consistently been viewed as a "fundamental component[ ] of the liberty safeguarded by the Due Process Clause." *Bellotti,* 435 U.S. 765, 98 S.Ct. 1407 (1978) (citing *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)); *see generally* Charles Warren, *The New "Liberty" Under the Fourteenth Amendment,* 39 Harv. L.Rev. 431 (1926). Even prior to the Constitutional Convention, and certainly before the Bill of Rights was proposed and ratified, the freedom to exercise religion was understood as a liberty of conscience; in other words, the people enjoyed the inalienable right to engage in religious worship "according to the dictates of their own consciences." Constitution of New Hampshire, Pt. 1, Art. IV (1784); Constitution of Massachusetts, Art. II (1780); Constitution of South Carolina, Art. XXXVIII (1778); Constitution of New York, Art. XXXVIII (1777); Constitution of Vermont, Ch. 1, Sec. 3 (1777); Constitution of North Carolina, Declaration of Rights, Art. XIX (1776); Constitution of Virginia, Declaration of Rights, Sec. 16 (1776); Constitution of Delaware, Declaration of Rights and Fundamental Rules, Sec. 2 (1776); Constitution of Maryland, Declaration of Rights, Art. XXXIII (1776); Constitution of New Jersey, Art. XVIII (1776); Constitution of Pennsylvania, Declaration of Rights, Art. II (1776).

■ It, therefore, cannot be reasonably disputed, if at all, that the purpose of the right to exercise religion was to secure to all *individuals* the liberty of conscience without government interference. What happens, then, when the individual chooses to participate in free enterprise? Does this liberty of conscience travel with an individual in his or her commercial endeavors as a shareholder of a corporation? This Court believes it does.

However, the government argues, and other federal judges addressing this issue have concluded, that an individual voluntarily relinquishes this liberty when he or she elects to engage in free enterprise under the veil of certain corporate forms. *See Grote,* 708 F.3d at 856 (Rovner, J., dissenting);[13] *see also Hobby Lobby Stores, Inc. v. Sebelius,* 870 F.Supp.2d 1278, 1291 (W.D.Okla.2012). With respect to closely-held corporations, Judge Rovner, in her dissent, warns of what is perceived as a "natural inclination for the owners of [closely held] companies to elide the distinction between themselves and the companies they own." *Grote,* 708 F.3d at 857. The basic purpose of incorporation, it has been held, is to " 'create a legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.' " *Id.* (quoting *Cedric*

---

13. It should be noted that Judge Rovner addressed this argument in terms of whether the contraceptive mandate placed a substantial burden on the individual plaintiff in that suit, as opposed to whether the corporate plaintiff had standing. In other words, the issue was framed as whether an individual can be burdened by a regulation that imposes financial penalties on a corporation it owns. Again, that mischaracterizes the injury. The fines imposed on the company are not the true harm here; the fines are simply the means by which the government coerces the individual to comply with the applicable law. The fundamental question remains the same—as between an individual and a corporation he owns, which of the two (or both) suffers the harm of a regulation that burdens religious freedom.

*Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001)). "[Corporations] do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors." *Hobby Lobby*, 870 F.Supp.2d at 1291. This principled demarcation of obligations and benefits seems to hinge in part on the benefit of limited liability gained by the individual in exchange for the relinquishment of the right to exercise religion. Judge Rovner ultimately concludes, based on that reasoning, that it is the individual—not the corporation—who enjoys the right to exercise religious freedom. *Grote*, 708 F.3d at 856–57. This argument fails to take into account the entire historical context of corporations during the founding era.

First, the Court will address why shareholders' enjoyment of limited liability is simply inapposite to whether that shareholder can exercise religion while engaging in free enterprise. To be sure, even late into the nineteenth century, limited liability was still not even uniformly accepted by all the states as a guaranteed attribute of the corporate form. *See* Herbert Hovenkamp, *The Classical Corporation in American Legal Thought*, 76 Geo. L.J. 1593, 1651 (June 1988) ("During the first third of the nineteenth century, American states experienced a general legislative and judicial reaction against limited liability."); *see also* Dante Figueroa, *Comparative Aspects of Piercing the Corporate Veil in the United States and Latin America*, 50 Duq. L.Rev. 683, 703 (Fall 2012) ("Limited liability statutes were not initially enacted across the United States, because many jurisdictions imposed shareholder liability in a number of areas of law for various

causes of action."). Indeed, corporations—as opposed to joint ventures, sole proprietorships, and partnerships—were an attractive vehicle for commerce because of the elements of centralized management, perpetual life, and the ability to hold property in the corporate name, Stephen B. Presser, *Piercing the Corporate Veil* § 1:3 (2013 ed.). True as it is that limited liability is oft regarded as the most important principle in modern corporate law, it cannot be said that such was the mindset at the time the Bill of Rights grafted into the constitution the inalienable right to exercise religion without interference by the government. It is not sound, therefore, to rely on the premise that individuals bartered for the privilege of limited personal liability in exchange for the relinquishment of their free exercise rights when engaging in commerce under the corporate form. That is so because it cannot be said that there even existed a guarantee of limited liability at that time.

Of course there is a meaningful distinction between shareholder and corporation, and over time the contours of the distinction have changed.[14] Chief Justice John Marshall, in what is often considered the primordial veil piercing case in the United States, writing for a unanimous Court, espoused the original "associational view" of corporations as "invisible, intangible, and artificial beings ... [that] may be considered as having corporeal qualities[,]" such that the corporation's citizenship (for federal jurisdictional purposes) was the citizenship of its shareholders rather than the state of incorporation or its principal place of business." *See United States v. Deveaux*, 9 U.S. 61, 86, 89, 5 Cranch 61, 3 L.Ed. 38 (1809). In *Louisville, C. & C.R. Co. v. Letson*, the Taney Court overruled

---

**14.** *See* Hovenkamp, *supra*, at 1597 (explaining the transition of the jurisprudential concept of the corporation from the "associational" view of the Marshall Court, to the "fictional" view of the Taney Court, to finally the "personal" or "entity" view that developed near the end of the 19th century).

*Deveaux* and adopted a "fictional" view of corporations, defining the corporate entity as an "artificial person" that inhabits the state of incorporation for jurisdictional purposes. 43 U.S. 497, 558, 2 How. 497, 11 L.Ed. 353 (1844).

■ That the corporeal and incorporeal dichotomy of the corporate personhood has transformed over centuries of Supreme Court jurisprudence is revealing, but not dispositive. It is true that a corporation is a fictional entity, separate and apart from its association of individuals, and it enjoys certain privileges benefitting both the association as a whole and the individuals alike. But the individuals are the real parties that make up the association and these individuals bring with them certain rights that, unless incompatible with the corporate form, should not be relinquished. It cannot be said here that the exercise of religion by an individual in association with other individuals is incompatible with any of its corporate privileges, whether we speak of the privilege of a shareholder to enjoy limited liability or the privilege of a corporation to exist in perpetuity. Put simply, an individual's right to freely exercise religion includes the right to exercise religion in association with others under the corporate umbrella. *See generally Citizens United,* 558 U.S. at 392, 130 S.Ct. 876 ("But the individual's right to speak includes the right to speak *in association with other individual persons*") (emphasis in original).

In fact, history teaches us that religious tolerance was intended to, and in fact did, inspire commercial prosperity in the early colonization of our nation. *See* Patrick Henry, *Religious Tolerance,* Stokes 1:311–12 (1766). Alexander Hamilton proclaimed that "[m]anufacturers, who (listening to the powerful invitations of ... what is far more precious than mere religious toleration, a perfect equality of religious privileges) would probably flock from Europe to the [U]nited [S]tates to pursue their own trades or professions ...."). *Report on Manufactures,* Papers 10:253–54 (Dec. 5, 1791). Hamilton was eventually proven correct. "Indeed, it was 'historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause.'" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (quoting *Bowen v. Roy,* 476 U.S. 693, 703, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (Burger, C.J.)).

Although it cannot be stated with any degree of certainty that the prosperity of our nation is attributable to the religious freedom Americans enjoy, history certainly cannot be ignored. To hold today that the one's unalienable "liberty of conscience" rests entirely on the form in which that individual elects to participate in free enterprise is counter to this Court's understanding of, and appreciation for, the right to the free exercise of religion guaranteed by the Constitution. *But see United States v. Lee,* 455 U.S. 252, 261, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). The historical backdrop of the First Amendment does not support the conclusion that an individual who engages in free enterprise utilizing a certain corporate form sheds the right to exercise his religion in his commercial endeavors.

The intersection of corporate form with individual rights is even more central when dealing with a closely held corporation, such as the case here. It would truly be form over substance to say there is a meaningful distinction between Beckwith Electric and Beckwith when it comes to religion. The government disagrees and argues that the regulations impose no obligation on Beckwith personally; rather, the obligation is on Beckwith Electric (a legally distinct entity) to use its corporate

funds to purchase the group policy and those same corporate funds to pay for the fines in the event Beckwith Electric fails to comply with the contraceptive mandate. The flaw in the government's argument is that it focuses on the financial burden instead of the religious burden on Beckwith personally.[15]

██ The government insists that it would be an error to hold that the religious beliefs of a corporation's owner are imputed to the corporation for purposes of the First Amendment and the RFRA. (Dkt. 24, pp. 6–7). Otherwise, the government argues, every secular corporation with a religious owner would be considered religious and impermissibly expand the scope the freedom to exercise religion and the RFRA. The government's "slippery slope" argument is not wholly without merit to the extent it is concerned that corporations might conjure up religious beliefs in an effort to escape compliance with a federal law with which they do not agree. But those cases are sure to be scant and are just as sure to be obvious. When an individual is acting through an incorporeal form, whether secular or religious, non-profit or for-profit, incorporated or a partnership, the individual does not shed his right to exercise religion merely because of the "corporate identity" he assumed. *See Citizens United,* 558 U.S. at 365, 130 S.Ct. 876 ("[T]he Government may not suppress political speech on the basis of speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations.").

This Court is persuaded by Judge Walton's well-reasoned analysis in *Tyndale House,* in which he relied heavily on *Stormans* and *Townley.* The corporate plaintiff in *Tyndale House* is a closely-held, for-profit Christian publishing company founded in 1962 by Dr. Kenneth Taylor and his wife, Margaret Taylor. *See* 904 F.Supp.2d at 111. The publishing company employs 260 full-time employees and provides each of them with health insurance through a self-insured plan. *Id.* The publishing company's CEO, Mark Taylor, joined as a plaintiff to challenge the application of the contraceptive mandate because it requires them "to provide and pay for drugs and devices that violate their religious beliefs, and subjects the plaintiffs to heavy fines and penalties if they choose to violate those beliefs." *Id.* at 112 (internal citations omitted). The government challenged the standing of the corporate plaintiff on the grounds that " 'for-profit corporation[s] [do] not exercise religion' within the meaning of the RFRA and the First Amendment." *Id.* at 114. Judge Walton found several facts relevant to the inquiry: the mission statements and corporate charters of the related companies to "minister to the spiritual needs of people," the corporation held a weekly "chapel service" for its employees, the majority shareholder (a nonprofit corporation) had a similarly faith-based mission statement, and the entire board of directors had to sign a "statement of faith" to show that they held certain religious beliefs. Declining to address whether for-profit corporations can exercise religion under the RFRA or the First Amendment, Judge Walton ultimately found that, "as in *Townley* and *Stormans,* the beliefs of [the corporate plaintiff] and its owners are indistinguishable" and, therefore, it has "shown an 'actual or imminent' injury-in-fact that is 'concrete and particularized' and 'fairly . . . traceable' to the contraceptive cover-

---

15. Although this discussion focuses on the corporate plaintiff, redefining the injury makes it much clearer that Beckwith is also suffering an injury that is causally related to the action by the government and, therefore, has standing independent of Beckwith Electric.

age mandate." *Id.* at 117 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130).

 Similarly, the facts in this case show that Beckwith Electric is inculcated with the beliefs of its owner and CEO. Beckwith manages the day-to-day operations of Beckwith Electric and is responsible for establishing all its operational policies. Beckwith believes that "a company managed under the living God's direction and by God's principles cannot engage in or promote activities that are contrary to such direction, principles, or moral compass." As such, Beckwith's personal religious beliefs, those of the Southern Baptist faith, pervade the corporate atmosphere at Beckwith Electric. Beckwith allocates corporate resources to fund weekly visits by corporate chaplains to visit the premises of Beckwith Electric and to counsel willing employees on issues regarding "bereavement, marriage, children, finances, addictions, elder care, and other types of crises." Beckwith Electric, at the behest of Beckwith, also donates to religious charities that provide religious-based services to the community, including New Life Solutions' Family Ministries, which is a "Christ-centered ministry offering hope, help, and healing for women, teens and families by promoting healthy lifestyle choices and relationships." Importantly, Beckwith, according to his religious beliefs, established Beckwith Electric's corporate policy that it will not obtain a group insurance policy that provides emergency contraceptive drugs or devices. Beckwith asserts that his religious beliefs prohibit him from managing a company, or allocating its resources, in any manner inconsistent with those beliefs, and the government does not challenge the sincerity of those beliefs.

The only arguably material distinction between *Tyndale House* and the extant case is that the corporate plaintiff in *Tyndale House* was "religious," i.e., it was a Christian publishing company, it had a mission statement with religious undertones, and its board of directors had to sign a statement of faith. Notably, the corporation was also for-profit. Seizing on this distinction, the government relies on the dictionary definition of "secular" (meaning "not overtly or specifically religious") to posit that it would "dramatically expand" the scope of the RFRA and the First Amendment to permit a secular corporation with a religious owner to avail itself the protection of the right to exercise religion. The Court disagrees. Clearly, an individual employed by a secular corporation has the right to exercise religion concomitantly with her employment. *See Sherbert*, 374 U.S. at 404, 83 S.Ct. 1790 (holding that an employee did not have to work a six-day week—in contravention of her religious beliefs—in order to qualify for state unemployment benefits). But, following the government's logic, that same individual would lose the right to exercise religion merely by changing hats and becoming the *employer* instead of *employee*. Hypothetically, that same individual (acting now as an employer) would not be able to challenge—on religious freedom grounds—a federal law that compelled (by threat of substantial fines) all "secular," for-profit businesses to remain open seven days a week. The Court sees no reason to distinguish religious freedom rights based upon the manner and form that one chooses to make a living. As plaintiffs' counsel remarked at the hearing, "the Southern Baptist faith doesn't give a pass to Mr. Beckwith because he's operating his business in the corporate form." Pragmatically, as the owner and operator of the company who is charged with setting policy, the beliefs of Beckwith are, in essence, the beliefs of Beckwith Electric.

I will end this discussion where it began. The contraceptive mandate does not, at this stage, seem to accommodate the notion of religious tolerance that is em-

bedded in the Constitution and made applicable here through the RFRA. On this record, the Court finds that Beckwith's unalienable right to freely exercise his religion is not relinquished simply because he chooses to engage in free enterprise using an available corporate form. Here, Beckwith is the majority shareholder and CEO of a closely-held corporation that is inculcated with his religious beliefs. Beckwith Electric is merely the instrument through and by which Beckwith expresses his religious beliefs, and, therefore, has a sufficient nexus with Beckwith to surpass the constitutional and prudential limitations of the Court's jurisdiction. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–59, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Beckwith Electric has shown an actual or imminent injury, that is "concrete and particularized," "fairly traceable" to the contraceptive coverage mandate, and one that can be redressed by a decision of this Court. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. To hold otherwise would place too great a burden on religious freedom based solely upon the manner and form in which an individual decides to conduct business. Accordingly, the Court finds that Beckwith Electric and Beckwith both have standing to challenge the contraceptive mandate in the extant case.

## II. Plaintiffs are likely to prevail on the merits.

Having decided that Beckwith Electric can exercise religion, or at the very least can assert the free exercise rights of Beckwith, the Court now turns to whether plaintiffs are likely to prevail on the merits of their claim. The RFRA forbids the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the government can "demonstrate[ ] that application of the burden to the person (1) is in fur-

therance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a, b).

## A. Does the ACA "substantially burden" the plaintiff's exercise of religion?

The next question is whether the contraceptive mandate is a "substantial burden." Under the RFRA, "exercise of religion" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *See* 42 U.S.C. § 2000bb–2 (defining "exercise of religion" as defined in 42 U.S.C. § 2000cc–5 (2006)). According to the record, plaintiffs' faith-based beliefs "prohibit them from providing, participating in, paying for, training others to engage in, or otherwise supporting emergency contraception, abortion, abortifacients, and any drugs, devices, and services that are capable of killing innocent human life." (Dkt. 10–1, ¶ 12). Consequently, Beckwith Electric alleges it cannot allocate its resources to providing FDA-approved emergency contraceptives. *Id.* It is not within the province of the Court to question the soundness or validity of a religious belief; it is enough that plaintiffs say they have the belief. See *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). In any event, the government does not challenge the sincerity of their beliefs. (Dkt. 24, p. 6). The contraceptive mandate clearly places a burden on plaintiffs, but the question is whether it is a "substantial" one.

To determine whether the contraceptive mandate is a "substantial burden" on the Plaintiffs' religious exercise, the Court must consider whether the government action puts substantial pressure on them "to

perform acts undeniably at odds with fundamental tenets of their religious beliefs." *See Yoder*, 406 U.S. at 218, 92 S.Ct. 1526. It is also a "substantial burden" if the government action puts "substantial pressure on an adherent to modify his behavior and to violate their beliefs[.]" *Thomas*, 450 U.S. at 716–17, 101 S.Ct. 1425. The Supreme Court has held that the "collection and payment of generally applicable taxes" do not typically impose a significant burden, but recognized that a "more onerous tax" may effectively "choke off" an adherent's religious practices so as to constitute a substantial burden. *Jimmy Swaggart Ministries v. Bd. of Equalization of California*, 493 U.S. 378, 392, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990).

The two cases expressly referenced in the RFRA—*Sherbert* and *Yoder*—are particularly instructive. In *Sherbert*, the Supreme Court held that the denial of state unemployment benefits because the plaintiff refused to work on Saturdays, in accordance with her religious beliefs, was a substantial burden on her religious exercise rights. 374 U.S. at 403–404, 83 S.Ct. 1790. The state unemployment law "forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id.* at 404, 83 S.Ct. 1790. In *Yoder*, the Supreme Court held that a state compulsory education law mandating high school attendance until the age of sixteen substantially burdened the plaintiffs' religious exercise because the "law affirmatively compel[led] them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." 406 U.S. at 218, 92 S.Ct. 1526. The Amish plaintiffs in *Yoder* believed that formal education beyond the eighth grade placed their youth in an environment hostile to their religious tenets because it placed too great an emphasis on competitive grades and sports, as opposed to the Amish lifestyle that favored manual labor and self-reliance. *Id.* at 211, 92 S.Ct. 1526.

Just as in *Sherbert*, the plaintiffs in the extant case are faced with the impossible choice of either complying with the contraceptive mandate and forfeiting their deeply held religious beliefs, on the one hand, or staying true to the tenets of their faith and facing substantial fines, on the other hand. *See* (Dkt. 10–1, ¶ 41). The burden of compliance is substantial in the extant case because of the specific manner in which Beckwith Electric currently operates its business. Beckwith Electric currently provides health insurance for its employees, but carves out coverage for contraceptive drugs and devices consistent with the beliefs of the Southern Baptist faith. As an alternative, Beckwith Electric provides its employees with counseling by corporate chaplains on matters relating to, among other things, family planning and women's health issues. As a means by which to force plaintiffs into compliance, the contraceptive mandate carries with it substantial penalties against those who do not comply. *See* 26 U.S.C. § 4980D(a, b) (imposing a tax against employers that do not provide compliant group plans in the amount of $100 per day for each employee); 26 U.S.C. § 4980H (establishing tax penalties in the amount of $2,000 per each full-time employee against any employer that fails to provide "minimal essential coverage"); 29 U.S.C. § 1132(a) (providing for civil enforcement actions). This type of compulsory compliance with a federal law is certainly a "substantial burden" on Beckwith Electric. *See Boerne*, 521 U.S. at 534, 117 S.Ct. 2157 ("Claims that a law substantially burdens someone's exercise of religion will often be difficult to contest.").

The government argues that any burden imposed by the contraceptive mandate is far too attenuated to constitute a "substan-

tial burden." (Dkt. 24, p. 12–13). Equating a group health plan with a salary, the government posits that Beckwith Electric, through Mr. Beckwith, "has no right to control the choices of his company's employees, who may or may not share his religious beliefs, when making *use* of their benefits." (Dkt. 24, p. 12) (emphasis added); *see also O'Brien v. HHS,* 894 F.Supp.2d 1149 (E.D.Mo.2012) ("[T]he particular burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [the company's] plan, subsidize *someone else's* participation in an activity that is condemned by plaintiffs' religion.") (emphasis in original); *Hobby Lobby,* 870 F.Supp.2d at 1294, *aff'd,* 2012 WL 6930302, at *3 (10th Cir.2012). The fallacy in this argument is that it mischaracterizes the burden placed on plaintiffs. Plaintiffs are not objecting to the *use* of emergency contraceptives by Beckwith Electric's employees. Rather, the particular burden to which plaintiffs object is the provision of group insurance premiums that covers emergency contraception. (Dkt. 10–1, ¶ 14). "Because it is the coverage, not just the use, of the contraceptives at issue to which the plaintiffs object, it is irrelevant that the use of the contraceptives depends on the independent decisions of third parties." *Tyndale House,* 904 F.Supp.2d at 123.

Accordingly, the Court finds that plaintiffs have met their burden of showing that the contraceptive mandate substantially burdens their religious exercise.

**B. The contraceptive mandate does not further of a compelling governmental interest, nor is it the least restrictive means.**

 The inquiry does not end merely because the government action is found to substantially burden religious exercise

rights. Once a plaintiff demonstrates a "substantial burden" on its religious freedom, the government then bears the burden of demonstrating a "compelling interest to justify that burden." *O Centro,* 546 U.S. at 429, 126 S.Ct. 1211.

The government asserts two compelling interests. First, the government claims to have a generalized interest in "safeguarding the public health by regulating the health care and insurance markets." (Dkt. 24, p. 13) (citing *Dickerson v. Stuart,* 877 F.Supp. 1556, 1559 (M.D.Fla.1995)) (additional internal citations omitted). As a direct benefit of a regulated health care and insurance market, the public will enjoy improved health conditions resulting from "reduced transmission, prevention or delayed onset, and earlier treatment of disease." (Dkt. 24, p. 13) (quoting 75 Fed. Regs. 41,726 and 41,733). Relying on the finding of the IOM, the government claims that increased access to FDA-approved contraceptive services are essential to the continued improvement of the predicted health outcomes. IOM Rep. at 20, 103. According to the IOM, the health risks stemmed largely from unintended pregnancies, which may delay access to prenatal care, prolong risky behavior that can endanger the fetus, as well as cause certain mental illness such as depression and anxiety. *Id.* Second, the government also claims a compelling interest in "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." (Dkt. 24, p. 14) (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 626, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). The government asserts that the ACA and contraceptive mandate are Congress's "attempt to equalize the provision of preventative care services, with the resulting benefit of women being able to equally contribute as healthy and productive members of society, furthers a

compelling governmental interest." (Dkt. 24, p. 14) (internal citations omitted).

The government's interest in promoting public health and equality of health care for women is certainly compelling in a broad, general sense. Citing the two cases expressly referenced in the RFRA, the Supreme Court noted, however, that courts should look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431, 126 S.Ct. 1211. For instance, in *Yoder*, the Supreme Court exempted Amish children from a compulsory school attendance law even though the state had a "paramount" interest in education." 406 U.S. at 213, 92 S.Ct. 1526. Absent a showing "with more particularity how its admittedly strong interest ... would be adversely affected by granting an exemption *to the Amish*[,]" the state was not able to satisfy its burden. Similarly, in *Sherbert*, the Supreme Court exempted a worker from a state law that denied unemployment benefits to persons that refused to work on Saturdays, but noted that this exemption would not apply to an individual whose "religious convictions serve to make him a nonproductive member of society." 374 U.S. at 410, 83 S.Ct. 1790. "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened. *O Centro*, 546 U.S. at 430–31, 126 S.Ct. 1211 (citing 42 U.S.C. § 2000bb–1(b)); see also 42 U.S.C. § 2000bb–1(b)(1) ("[The] Government] may substantially burden a person's exercise of religion *only if it demonstrates that application of the burden to the person ....* ") (emphasis added).

The Court is not particularly persuaded by the government's evidence to support its compelling interest. For example, there is no empirical data or other evidence in the cited provisions of the IOM that would support the conclusion that the provision of the FDA-approved emergency contraceptives (in addition to the contraceptives to which plaintiffs do not object) would result in fewer unintended pregnancies, an increased propensity to seek prenatal care, or a lower frequency of risky behavior endangering unborn babies. *See, e.g., Tyndale House*, 904 F.Supp.2d at 126–27.

Additionally, plaintiffs argue that the "massive" number of employees and plan participants omitted from the contraceptive mandate vis-a-vis the several exemptions "radically undermines" any claim that the mandate furthers a compelling interest. (Dkt. 10, pp. 1520). The parties disagree mightily as to the size and the effect of the exemptions. The government characterizes the plaintiffs' 200 million figure as a "gross" overstatement of the individuals in grandfathered plans. (Dkt. 24, p. 16, at n. 13) (citing statistics from the Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits 2012 Annual Survey, available at http://ehbs.kff.org/pdf/2012/8345.pdf). Unfortunately, while the empirical data supplied by the government does show a downward trend of grandfathered health plans, the government fails to provide the Court with any meaningful information from which it can derive the actual number of employees exempted from compliance with the contraceptive mandate. Even on this record, it appears the number is quite large. *See also Geneva College*, 929 F.Supp.2d at 434, 2013 WL 838238, at *25 ("[S]everal other courts addressing similar challenges to the mandate's requirements pointed out that over 190 million individuals have already been

exempted from the mandate's requirements as a result of the grandfathering provisions in the ACA.") (citing *Newland v. Sebelius*, 881 F.Supp.2d 1287, 1298 (D.Colo.2012) ("[t]he government has exempted over 190 million health plan participants ... from the preventative care coverage mandate")); *Tyndale House*, 904 F.Supp.2d at 128 ("Indeed, the 191 million employees excluded from the contraceptive coverage mandate include those covered by grandfathered plans alone.")). The government's best case scenario is that by the end of 2013, 51 percent of employer plans will have lost "grandfathered" status. *See* (Dkt. 24, p. 16, n. 13 (citing 75 Fed. Reg. at 34,552–53). That still leaves roughly a third of America's population (i.e., 100 out of 313.0 million) exempt from the contraceptive mandate.

Generally speaking, that several million Americans are already exempt from the RFRA cuts against a finding that the government has a compelling interest here to be served by the contraceptive mandate. *See, e.g., O Centro*, 546 U.S. at 432–34, 126 S.Ct. 1211 ("The fact that the [Controlled Substances] Act itself contemplates that exempting certain people from its requirements would be 'consistent with the public health and safety' indicates that congressional findings with respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them."); *Church of the Lukumi Babalu*, 508 U.S. at 537, 113 S.Ct. 2217 ("As we noted in

*Smith*, in circumstances in which individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of religious hardship without compelling reasons.' ") (internal citations omitted).

Turning to whether the purportedly compelling interest is satisfied with respect to these plaintiffs, as this Court must do, *see id.* at 430–31, 126 S.Ct. 1211, the result remains the same. On this record, it is undisputed that as of August 2012, "no plan participant has used the coverage for any abortifacient drugs from the list of emergency contraceptives." *See* (Dkt. 10–2, ¶ 12). Importantly, the government has the burden to establish this prong of the analysis because it is an affirmative defense. *See O Centro*, 546 U.S. at 429–30, 126 S.Ct. 1211. Taking what each party says at face value—plaintiffs claim that hundreds of millions are exempt and the government says it's a fraction of that—the Court is left with record evidence that is, at best, in equipoise. Accordingly, the government failed to meet its burden of proof that the contraceptive mandate furthers a compelling government interest. *See id.* (affirming injunctive relief granted because the evidence of the government's compelling interest was in equipoise).[16]

### III. Plaintiffs will suffer irreparable harm if the injunction does not issue.

It is well-settled that "[t]he loss of First Amendment freedoms, for

---

16. Because the Court finds that the government failed to satisfy its burden that the contraceptive mandate furthers a compelling government interest, the Court need not reach the question of whether it is the least restrictive means. That being said, the Court notes that the government is currently subsidizing contraceptives. Enacted in 1970, Title X of the Public Health Service Act provides funding for family planning and related preventative health services. *See* 42 C.F.R. 59.5. In 2011, $276 million of the $1.3 billion spent on

delivering Title X-funded family planning services came directly from Title X revenue sources. Certainly forcing private employers to violate their religious beliefs in order to supply emergency contraceptives to their employees is more restrictive than finding a way to increase the efficacy of an already established program that has a reported revenue stream of $1.3 billion. *See* Family Planning Annual report: 2011 National Summary, available at http://www.hhs.gov/opa/pdfs/fpar–2011–national–summary.pdf.

even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). "Although a violation of the First Amendment 'does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits,' the injury in this case constituted 'direct penalization, as opposed to incidental inhibition' of First Amendment rights and thus could not be remedied absent an injunction." *KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1272 (11th Cir.2006) (quoting *Hohe v. Casey,* 868 F.2d 69, 72–73 (3d Cir.1989)). Since June 1, 2013, the plaintiffs have been in violation of the contraceptive mandate. The penalties for continued noncompliance could be crippling, and effectively force Beckwith Electric to close its door or violate its sincerely held religious beliefs. The Court finds that the record supports a finding that plaintiffs will suffer irreparable harm in the event an injunction does not issue.

### IV. The balance of harms tips in favor of the plaintiffs.

■ The government argues that "[e]njoining the regulations as to for-profit, secular companies would undermine the government's ability to achieve Congress's goals of improving the health of women and children and equalizing the coverage of preventative services for women and men." (Dkt. 24, p. 20). In light of the several million Americans already exempted from coverage under the contraceptive mandate, the Court is not persuaded that there is any real harm to the government in this case. Moreover, as the plaintiffs point out, the government has already consented to the entry of injunctive relief in several other cases. *See* (Dkt. 10, p. 23) (citing *Geneva College,* 941 F.Supp.2d at 686–87, 2013 WL 1703871, at *12 (identifying several cases in which the government

acquiesced to injunctive relief)). If the government is willing to grant exemptions for no less than one third of all Americans, and it is willing to consent to injunctive relief in cases that do not fall within those exemptions, then it can suffer no appreciable harm by permitting an additional 168 employees (i.e., less than .0002 percent of those already exempted) to be exempted. Accordingly, the balance of harms tips in favor of plaintiffs.

### V. It is in the public interest to grant the injunction.

■ As the Eleventh Circuit has noted, it is never in the public interest to enforce unconstitutional laws. *See KH Outdoor,* 458 F.3d at 1272 (citing *Joelner v. Vill. of Washington Park,* 378 F.3d 613, 620 (7th Cir.2004) (noting "it is always in the public to protect First Amendment liberties")). Defendant argues counter that "[i]t would be contrary to the public interest to deny Beckwith Electric's employees (and their families)—who may not share Mr. Beckwith's beliefs—the benefits of the preventative coverage regulations. (Dkt. 24, p. 20) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). The flaw in the government's argument is that the record evidence suggests that Beckwith Electric's employees are not burdened at all by the decision to withhold coverage for emergency contraceptives from the group policy. There is no evidence that Beckwith Electric's employees sought but were refused access to the FDA-approved emergency contraceptives to which plaintiffs object. In fact, there is evidence to the contrary. *See* (Dkt. 10–2, ¶ 12). As such, and having found that the contraceptive mandate likely violates the religious freedom rights of the plaintiffs, the Court finds that it is in the public interest to grant the injunction.

## VI. Conclusion

The First Amendment, and its statutory corollary the RFRA, endow upon the citizens of the United States the unalienable right to exercise religion, and that right is not relinquished by efforts to engage in free enterprise under the corporate form. No legislative, executive, or judicial officer shall corrupt the Framers' initial expression, through their enactment of laws, enforcement of those laws, or more importantly, their interpretation of those laws. And any action that debases, or cheapens, the intrinsic value of the tenet of religious tolerance that is entrenched in the Constitution cannot stand. On this record, the plaintiffs have established all four elements for the entry of a preliminary injunction. Accordingly, it is

**ORDERED** that plaintiffs' motion for preliminary injunctive relief is **GRANTED**. The government is enjoined from enforcing the contraceptive mandate consistent with the terms of this order. Plaintiffs are required to post a bond in the amount of $75,000.00.